## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:  TENRGYS, LLC, *et al.*,[1]              CASE NO. 21-01515-JAW
DEBTORS (Jointly Administered)                         CHAPTER 11

---

### DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF TENRGYS, LLC AND ITS DEBTOR SUBSIDIARIES

---

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

The Debtors are providing the information in this Disclosure Statement to Holders of Claims and Interests for purposes of soliciting votes to accept or reject the joint plan of reorganization of Tenrgys, LLC and the other Debtors in these jointly administered Chapter 11 Cases, under Chapter 11 of the Bankruptcy Code. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Risk Factors described in Article IX herein.

---

[1] Jointly administered with *In re Tellus Energy, LLC*, No. 21-01516-JAW; *In re Top Ten Holdings, LLC*, No. 21-01517-JAW; *In re Treetop Midstream Services, LLC*, No. 21-01518-JAW; *In re Acadiana Mineral Owners, LLC*, No. 21-01519-JAW; *In re Antioch Pipeline Company, LLC*, No. 21-01546-JAW; *In re BAX, LLC*, No. 21-01520-JAW; *In re BGGCO, LLC*, No. 21-01537-JAW; *In re BOE, LLC*, No. 21-01521-JAW; *In re BT Lands, LLC*, No. 21-01538-JAW; *In re BXO Lands, LLC*, No. 21-01539-JAW; *In re Cohay Conservation Area, LLC*, No. 21-01540-JAW; *In re Cohay Wildlife, LLC*, No. 21-01541-JAW; *In re Eutaw Ventures, LLC*, No. 21-01522-JAW; *In re Greenleaf CO2 Solutions, LLC*, No. 21-01542-JAW; *In re Highland Colony Capital, LLC*, No. 21-01543-JAW; *In re Jurassic Seismic Company*, No. 21-01549-JAW; *In re LASO, LLC*, No. 21-01523-JAW; *In re Leaf River Land Co., LLC*, No. 21-01544-JAW; *In re NOMS, LLC*, No. 21-01524-JAW; *In re North Cohay, LLC*, 21-01525-JAW; *In re PCE, LLC*, No. 21-01526-JAW; *In re RFND, LLC*, No. 21-01527-JAW; *In re RFS, LLC*, No. 21-01528-JAW; *In re SNPI, LLC*, No. 21-01529-JAW; *In re South Cohay, LLC*, No. 21-01530-JAW; *In re STP Ventures, LLC*, No. 21-01531-JAW; *In re Tallahala Exploration, LLC*, No. 21-01532-JAW; *In re Telpico USA, LLC*, No. 21-01533-JAW; *In re TC Energy, LLC*, No. 21-01534-JAW; *In re TPCO, LLC*, No. 21-01545-JAW; *In re WCOA, LLC*, No. 21-01535-JAW; *In re WYC Lands, LLC*, No. 21-01547-JAW; and *In re Xlake Pipeline Company, LLC*, No 21-01548-JAW.

[2] Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

**Subject to the foregoing and the terms and conditions of the RSA, the Plan is supported by the Debtors, Tellus Operating Group, LLC ("TOG"), and FSEP Investments, Inc. ("FSEP"), as the sole stockholder of FS Energy and Power Fund ("FS Energy" and together with FSEP, the "Consenting 2013 Loan Lender"). The Debtors urge Holders of Claims whose votes are being solicited to accept the Plan.**

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the proposed transactions contemplated thereby. Furthermore, the Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Court's approval of the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain events (including anticipated events) in the Debtors' Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses and their future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors or any other authorized party may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether because

of new information, future events, or otherwise. Holders of Claims reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to File an amended or modified Plan and related Disclosure Statement from time to time for the Debtors.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Plan is confirmed by the Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims who do not submit ballots to accept or reject the plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read the Plan and this Disclosure Statement in its entirety, including Article VII, entitled "RISK FACTORS," which begins on page 47, before submitting your ballot to vote on the Plan.

The Court's approval of this Disclosure Statement does not constitute a guarantee by the Court of the accuracy or completeness of the information contained herein or an endorsement by the Court of the merits of the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in

accordance with federal or state securities laws or other similar laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in Section 1145 of the Bankruptcy Code. Other Securities may be issued under other applicable exemptions under the federal securities laws. To the extent exemptions from registration under Section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the Securities may not be offered or sold except under a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about:

- the Debtors' business, acquisition and financial strategies;

- the Debtors' financial condition, revenues, cash flows, and expenses;

- the Debtors' levels of indebtedness, liquidity, and compliance with debt covenants;

- the Debtors' budget projections and operating forecasts;

- successful results from the Debtors' operations;

- general economic and business conditions;

- future global or regional health pandemics;

- risks associated with the Chapter 11 process, including the Debtors' inability to develop, confirm, and consummate a plan under Chapter 11 or an alternative restructuring transaction;

- **the Debtors' inability to maintain relationships with suppliers, customers, employees, and other third parties as a result of the Chapter 11 filing;**

- **the Debtors' failure to satisfy the Debtors' short- or long-term liquidity needs, including their inability to generate sufficient cash flow from operations or to obtain adequate financing to fund their capital expenditures and meet working capital needs and their ability to continue as a going concern;**

- **large or multiple customer defaults on contractual obligations, including defaults resulting from actual or potential insolvencies;**

- **the Debtors' legal proceedings and the effects thereof;**

- **the Debtors' ability to resume payment of distributions in the future or maintain or grow them after such resumption;**

- **the Debtors' drilling locations;**

- **the Debtors' oil, natural gas, and NGL reserves;**

- **the Debtors' realized oil, natural gas, and NGL prices and overall health of the oil and natural gas industry;**

- **the Debtors' production volumes;**

- **the Debtors' capital expenditures;**

- **the Debtors' economic and competitive advantages;**

- **credit and capital market conditions;**

- **regulatory changes;**

- **the Debtors' lease operating expenses, general and administrative expenses, and development costs;**

- **the Debtors' future operating results, including results of acquired properties;**

- **the Debtors' plans, objectives, expectations, and intentions; and**

- **integration and the resulting benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness.**

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include the following: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; the Debtors' ability to access financing necessary to consummate the Plan; general economic, business, and market conditions; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to competition or price pressures by customers; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; trade balance; natural disasters; geopolitical instability; the impact of the COVID-19 pandemic and government responses thereto; and the effects of governmental regulation on the Debtors' businesses.

## Table of Contents

I.      INTRODUCTION ..................................................................................................13
II.     PRELIMINARY STATEMENT ...........................................................................13
III.    THE DEBTORS' CORPORATE STRUCTURE AND BUSINESS OVERVIEW .......15
        A.     The Debtors ..................................................................................................15
        B.     Assets and Operations .................................................................................17
               1.     The Upstream Debtors .....................................................................17
               2.     The Midstream Debtors ...................................................................20
               3.     The Real Estate Debtors ..................................................................21
               4.     Valuation of the Debtors' Assets .....................................................21
        C.     Prepetition Capital Structure .......................................................................21
               1.     2012 RBL Facility ...........................................................................21
               2.     The 2013 Term Loan .......................................................................22
               3.     LLC Membership Interests .............................................................22
IV.     OVERVIEW OF THE PLAN ................................................................................23
        A.     The Colombian Collateral Tender Transaction .............................................23
        B.     Treatment of the 2013 Loan Claim ..............................................................24
        C.     Exit Financing ..............................................................................................24
        D.     Governance ...................................................................................................24
        E.     Recoveries to Claim Holders .......................................................................24
        F.     General Settlement of Claims and Interests...................................................25
        G.     Releases ........................................................................................................25
V.      QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
        STATEMENT AND PLAN ...................................................................................26
        A.     What is Chapter 11? .....................................................................................26
        B.     Why are the Debtors sending me this Disclosure Statement? .......................26
        C.     Am I entitled to vote on the Plan? ................................................................26
        D.     What will I receive from the Debtors if the Plan is consummated? ...............27
        E.     What will I receive from the Debtors if I hold an Allowed Administrative
               Claim or a Priority Tax Claim? .....................................................................30
               1.     Administrative Claims .....................................................................30
               2.     Priority Tax Claims .........................................................................30
        F.     [Are there any regulatory approvals required to consummate the Plan? .............31
        G.     What happens to my recovery if the Plan is not confirmed or does not go
               effective? ......................................................................................................31
        H.     If the Plan provides that I get a distribution, do I get it upon
               Confirmation or when the Plan goes effective, and what is meant by
               "Confirmation," "Effective Date," and "Consummation?" ...........................31
        I.     What are the sources of Cash and other consideration required to fund
               the Plan? .......................................................................................................31
        J.     Are there risks to owning Reorganized Tenrgys Membership Interests
               upon emergence from Chapter 11? ...............................................................32
        K.     Is there potential litigation related to the Plan? ...........................................32
        L.     Will Royalty and Working Interests be affected by the Plan? .......................32
        M.     Will the final amount of Allowed General Unsecured Claims affect the
               recovery of Holders of Allowed General Unsecured Claims under the

Plan?...................................................................................................................32

N.    What will happen to Executory Contracts and Unexpired Leases under the Plan?...............................................................................................33

O.    How will Claims asserted with respect to rejection damages affect my recovery under the Plan? ....................................................................34

P.    How will Governmental Claims affect my recovery under the Plan?.....................34

Q.    How will the resolution of certain contingent, unliquidated, and disputed litigation Claims affect my recovery under the Plan?................................35

R.    What happens to contingent, unliquidated, and disputed Claims under the Plan?...............................................................................................35

S.    How will the preservation of the Causes of Action impact my recovery under the Plan?.................................................................................36

T.    How will the release of Avoidance Actions affect my recovery under the Plan?...................................................................................................37

U.    Are the Debtors assuming any indemnification obligations for their current officers and directors under the Plan?...............................................37

V.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ........................................................................................37

    1.    Releases by the Debtors. ..................................................................39

    2.    Releases by the holders of Claims and Interests. ...........................40

    3.    Exculpation. .....................................................................................41

W.    What impact does the Claims Bar Date have on my Claim?...................................42

X.    What is the deadline to vote on the Plan? ..............................................................42

Y.    How do I vote for or against the Plan? ...................................................................43

Z.    Why is the Court holding a Confirmation Hearing?...............................................43

AA.    When is the Confirmation Hearing set to occur? ...................................................43

BB.    What is the purpose of the Confirmation Hearing? ................................................43

CC.    What is the effect of the Plan on the Debtors' ongoing business?..........................43

DD.    Will any party have significant influence over the corporate governance and operations of Reorganized Tenrgys? .......................................................44

EE.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................................................45

FF.    Do the Debtors recommend voting in favor of the Plan?........................................45

GG.    Who Supports the Plan?..........................................................................................45

VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ...............................................................................................46

A.    Expected Timetable of the Chapter 11 Cases ........................................................46

B.    First Day Relief ......................................................................................................46

C.    Proposed Case Timeline .........................................................................................46

As part of the RSA, the Debtors agreed to the following case milestones to ensure that the Debtors' Chapter 11 Cases proceed in a structured and expeditious manner towards confirmation:..................................................46

D.    Other Procedural and Administrative Motions.......................................................46

E.    Retention of Professionals......................................................................................46

F.    Other Litigation Matters.........................................................................................47

G.    Rejection and Assumption of Executory Contracts and Unexpired Leases .........47

VII.    RISK FACTORS ......................................................................................................47

A.    Bankruptcy Law Considerations ................................................................48
       1.    There Is a Risk of Termination of the RSA .............................48
       2.    Parties in Interest May Object to the Plan's Classification of
              Claims and Interests ................................................................48
       3.    The Conditions Precedent to the Effective Date of the Plan May
              Not Occur ................................................................................48
       4.    The Debtors May Fail to Satisfy Vote Requirements.....................48
       5.    The Debtors May Not Be Able to Secure Confirmation of the Plan .........48
       6.    Nonconsensual Confirmation.........................................................49
       7.    Continued Risk upon Confirmation................................................50
       8.    The Chapter 11 Cases May Be Converted to Cases under Chapter
              7 of the Bankruptcy Code ..........................................................50
       9.    The Debtors May Object to the Amount or Classification of a
              Claim ........................................................................................51
       10.   Risk of Non-Occurrence of the Effective Date...............................51
       11.   Contingencies Could Affect Votes of Impaired Classes to Accept
              or Reject the Plan .....................................................................51
       12.   Releases, Injunctions, and Exculpations Provisions May Not Be
              Approved...................................................................................51
B.    Risks Related to Recoveries under the Plan .................................................52
       1.    The Debtors May Not Be Able to Achieve their Projected
              Financial Results .......................................................................52
       2.    Certain Holders of Equity Issued Under the Plan May Be
              Restricted in their Ability to Transfer or Sell their Securities ....................52
       3.    Certain Securities Law Implications of the Plan............................53
       4.    The Debtors May Not Be Able to Accurately Report Their
              Financial Results .......................................................................53
C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses .............53
       1.    The Reorganized Debtors May Not Be Able to Generate Sufficient
              Cash to Service All of their Indebtedness........................................53
       2.    The Debtors Will Be Subject to the Risks and Uncertainties
              Associated with the Chapter 11 Cases ...........................................54
       3.    Operating in Bankruptcy for a Long Period of Time May Harm
              the Debtors' Businesses .............................................................54
       4.    Financial Results May Be Volatile and May Not Reflect Historical
              Trends ......................................................................................55
       5.    The Debtors' Substantial Liquidity Needs May Impact Production
              Levels and Revenue....................................................................55
       6.    Oil and Natural Gas Prices Are Volatile, and Decreases in Oil or
              Natural Gas Prices Could Materially Adversely Affect the
              Debtors' Businesses, Results of Operations, and Financial
              Condition..................................................................................56
       7.    Drilling for and Producing Oil and Natural Gas Are High Risk
              Activities with Many Uncertainties that Could Adversely Affect
              the Debtors' Business, Financial Condition and Results of
              Operations.................................................................................57
       8.    The Reorganized Debtor May Be Adversely Affected by Potential

        Litigation ................................................................................................58

      9.     The Loss of Key Personnel Could Adversely Affect the Debtors'
            Operations .......................................................................................59

      10.    Certain Claims May Not Be Discharged and Could Have a
            Material Adverse Effect on the Debtors' Financial Condition and
            Results of Operations ......................................................................59

**VIII.**   **SOLICITATION AND VOTING PROCEDURES**........................................**59**

    A.    Holders of Claims Entitled to Vote on the Plan .......................................60

    B.    Voting on the Plan .....................................................................................60

    C.    Ballots Not Counted .................................................................................60

**IX.**    **CONFIRMATION OF THE PLAN** ..............................................................**61**

    A.    Requirements for Confirmation of the Plan .............................................61

    B.    Best Interests of Creditors/Liquidation Analysis.....................................61

    C.    Feasibility ..................................................................................................62

    D.    Acceptance by Impaired Classes ...............................................................63

    E.    Confirmation Without Acceptance by All Impaired Classes....................63

      1.     No Unfair Discrimination ................................................................64

      2.     Fair and Equitable Test....................................................................64

    F.    The Plan Supplement.................................................................................64

**X.**     **TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
      SECURITIES LAWS**...................................................................................**65**

    A.    New Reorganized Tenrgys Membership Interests.....................................65

**XI.**    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
      OF THE PLAN** ...........................................................................................**66**

    A.    Introduction...............................................................................................66

    B.    Certain U.S. Federal Income Tax Consequences to the Debtors and
        Reorganized Debtors .................................................................................68

    C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of
        Claims .......................................................................................................69

      1.     U.S. Federal Income Tax Consequences to U.S. Holders of Allowed
            Claims Against the Debtors. ............................................................69

      2.     Accrued Interest................................................................................70

      3.     Market Discount ..............................................................................70

      4.     Limitation on Use of Capital Losses................................................71

      5.     Determination of Issue Price for Exit Facility and Reorganized
            Tenrgys .............................................................................................71

      6.     U.S. Federal Income Tax Consequences to PanAm ......................72

      PanAm's receipt of the membership interests of Telpico will generally be
            taxed as described in 1 above. With respect to Telpico, there are
            certain tax elections which may be favorable to PanAm and
            which should be discussed with their tax advisor. .........................72

      7.     U.S. Federal Income Tax Consequences to Holders of Owning and
            Disposing of Reorganized Tenrgys Membership Interests. .........72

    D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S.
        Holders of Claims.....................................................................................74

      1.     Consequences to Non-U.S. Holders of Claims................................74

    E.    Information Reporting and Back-Up Withholding .......................................75

**XII.    RECOMMENDATION** ...................................................................................................76

## **EXHIBITS**[3]

Exhibit A:      Plan of Reorganization

Exhibit B:      Corporate Organization Chart

Exhibit C:      Disclosure Statement Order

Exhibit D:      Liquidation Analysis

Exhibit E:      Financial Projections

---

[3] Each Exhibit is incorporated herein by reference.

## I.   INTRODUCTION

Tenrgys, LLC ("Tenrgys") and each of its debtor subsidiaries (collectively with Tenrgys, the "Debtors") submit this disclosure statement (this "Disclosure Statement") under Section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance with respect to the *Joint Chapter 11 Plan of Reorganization of Tenrgys, LLC and its Debtor Subsidiaries* (the "Plan"), dated [●], 2021.[4] A copy of the Plan is attached hereto as Exhibit "A" and incorporated herein by reference. The Plan constitutes a separate Chapter 11 plan for each of the Debtors.

**THE DEBTORS, TOG, AND THE CONSENTING 2013 LOAN LENDER SUPPORT THE PLAN. THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.   PRELIMINARY STATEMENT

### A.   The Debtors and the Debt

The Debtors operate an independent oil and natural gas business. Headquartered in Ridgeland, Mississippi, as of September 1, 2021, the Debtors had 11 productive fields and fieldwide units in Mississippi and Louisiana. As of August 2021, the Debtors had total proved reserves of approximately 10 million barrels of oil and 102 billion cubic feet of natural gas.

The Debtors also own and operate midstream services and facilities such as pipelines, processing and storage facilities, and compression plants to support their production activities. The corporate structure and the business of the Debtors is described below in Section III, "THE DEBTORS' CORPORATE STRUCTURE AND BUSINESS OVERVIEW."

The Debtors have approximately $129 million of funded debt principal (plus accrued interest) under two debt facilities, in which Tenrgys is the primary borrower and the other Debtors are guarantors. The Debtors have a secured reserve-based lending facility under a *Second Amended and Restated Credit Agreement* dated August 30, 2012, including as thereafter amended (the "2012 RBL Facility"), which has been held by PanAm19 Holdings, LLC ("PanAm") since April 8, 2019. The 2012 RBL Facility is secured by substantially all of the Debtors' assets, including 100% of the membership interests of Telpico. The Debtors also have an unsecured term loan facility under a *Term Loan Agreement* dated December 23, 2013 (the "2013 Loan"), which has been held by FSEP since May 29, 2019.

---

[4] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

## B.     Events Leading to the Chapter 11 Filings

Tenrgys borrowed money under the 2012 RBL Facility and the 2013 Loan to finance capital expenditures for the growth of the Debtors' business. The Debtors successfully grew, developed, and operated their business until commodity prices fell precipitously in late 2014 and early 2015. Oil prices that had remained above $90 a barrel for more than five years plunged to as low as $26 a barrel by February 2016. At the same time, changes in banking regulations made traditional reserve-based financing for oil and gas operations much more difficult to obtain. In 2015 and 2016, nearly 110 exploration and production companies filed Chapter 11 bankruptcy.

In addition to the severe challenges facing the entire oil and gas industry, the Debtors experienced the unique strain placed on their cash flow from investing millions of dollars in infrastructure to acquire and transport carbon dioxide "$CO_2$" from the Mississippi Power Company ("MPCO") coal gasification power plant, only to have MPCO fail to complete the power plant that would have been the source of $CO_2$.

Working with their lenders, the Debtors initiated a series of actions to reduce the indebtedness under the 2012 RBL Facility, including divesting certain assets and using the proceeds of the sales to pay down indebtedness. From January 2016 through June 2017, the Debtors successfully completed six asset sales that made possible a substantial reduction in the indebtedness under the 2012 RBL Facility from approximately $151 million to approximately $53 million. The anticipated final step in the sequence of divestitures to pay all or nearly all of the 2012 RBL Facility was to be the sale of the Debtors' interests in the Baxterville Field. Unfortunately, Regions Bank wrongfully dishonored a check to the Debtor's largest mineral lessor, which resulted in lease-termination claims that scuttled the sale and the Debtors' plan to restructure their debts and obtain additional working capital. The 2012 RBL Facility matured without being repaid due to Regions' wrongful dishonor of the check. The 2013 Loan has also matured.

While preparing for the possible need to file bankruptcy petitions, the Debtors were contacted by a prospective investor interested in Telpico's operations in Colombia. Initially, the parties discussed a deal in which the investor (through PanAm, the company he would form) would fund the remaining seismic and drilling investments in Colombia in exchange for an assignment of a portion of Telpico's Colombian Assets.

When it appeared that a bankruptcy forced by the Debtors' lenders would impede PanAm's investment in the Colombian Assets, PanAm and Tenrgys collaborated to facilitate PanAm's purchase of the 2012 RBL Facility. On April 2, Tenrgys and PanAm executed a letter of understanding regarding some of the terms of their initial agreement. On April 8, 2019, PanAm acquired the 2012 RBL Facility.

Between April 2019 and August 2021, the Debtors engaged in extensive negotiations with PanAm and the Consenting 2013 Loan Lender in an effort to finalize an agreement that would equitize all or part of the debt under the 2012 RBL Facility and restructure the 2013 Loan, thereby enabling Tenrgys to obtain additional financing for the development of its domestic assets and the Colombian Assets. But as the discussions progressed, PanAm insisted on increasingly difficult terms. On more than one occasion, PanAm canceled the scheduled closing of the transaction in order to make still further demands. By August 2021, PanAm was insisting on

terms that effectively would have given PanAm unilateral control over all of the Debtors' business and the ability later to take all of the economic upside of the transaction, while saddling the Debtors' management with a disproportionate share of the working capital obligations and associated risk, and leaving Tenrgys's members with little hope of significant participation in the Debtors' profit in the near future.

Faced with unacceptable deal terms, and a vote by the Tenrgys membership not to accept those terms, the Debtors engaged financial advisors and legal counsel to advise management and the board of directors regarding potential strategic alternatives to enhance the Debtors' liquidity and address their capital structure. Ultimately, as outlined in more detail elsewhere in this Disclosure Statement, the Debtors succeeded in securing the support of the Consenting 2013 Loan Lender for a restructuring plan to be implemented by these Chapter 11 Cases. The Restructuring Transactions contemplated by the Plan, if confirmed, will (1) satisfy the 2012 RBL Facility debt in full through the Colombian Collateral Tender, (2) equitize a substantial portion of the 2013 Loan, and (3) keep all of the Debtors' other creditors and contractual counterparties current and unimpaired, avoiding disruption to the Debtors' business and preserving the jobs of the Debtors' and TOG's employees. The Debtors management and board have determined that the Restructuring Transactions represent the best available means for the Debtors to maximize the value of their estates for the benefit of all stakeholders.

[On October [●], 2021, the Bankruptcy Court entered the *Order (I) Approving the Adequacy of the Disclosure Statement (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Amended Joint Plan of Reorganization of Tenrgys, LLC and its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices In Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* (Dkt. # [●])]. As of the date hereof, the Debtors have commenced solicitation of votes to approve the Plan.

## III.    THE DEBTORS' CORPORATE STRUCTURE AND BUSINESS OVERVIEW

### A.    The Debtors

The Debtors operate an independent oil and natural gas business. Headquartered in Ridgeland, Mississippi, as of September 1, 2021, the Debtors had 11 productive fields and fieldwide units in Mississippi and Louisiana, as illustrated below:



A summary corporate organizational chart of the Debtors is shown below. A full corporate organizational chart is attached hereto as Exhibit "B."



Debtor Tellus Energy, LLC ("Tellus Energy") and its wholly owned Debtor subsidiaries Acadiana Mineral Owners, LLC; BAX, LLC; BOE, LLC; Eutaw Ventures, LLC; Jurassic Seismic Company; LASO, LLC; NOMS, LLC; North Cohay, LLC; PCE, LLC; RFND, LLC; RFS, LLC; SNPI, LLC; South Cohay, LLC; STP Ventures, LLC; Tallahala Exploration, LLC; TC Energy, LLC; Telpico USA, LLC; and WCOA, LLC (collectively, the "Upstream Debtors") are involved in the "upstream" segment of the oil-and-gas industry, which means that their business includes the exploration, drilling, and extraction of oil, minerals, and gaseous hydrocarbons, and other activities associated with the initial stages of oil-and-gas production.

Tellus Energy also owns 100% of the LLC membership interests (the "Telpico LLC Interests") in its non-Debtor subsidiary Telpico, LLC which, in turn, owns 100% of the LLC interests in its Colombian branch, Telpico Colombia, LLC (together, "Telpico"). Telpico holds a 100% interest in, and has operating control of, three Colombian oil and gas concessions: Llanos 42, VSM 22, and VSM 3, covering more than 260,000 acres. These concessions are governed and regulated by the Colombian *Agencia Nacional de Hidrocarburos*, or National Hydrocarbons Agency (the "ANH"), and Telpico holds various contracts with the ANH regarding Telpico's rights and interests with respect to Llanos 42, VSM 22, and VSM 3. (Telpico's assets, including its rights and interests concerning Llanos 42, VSM 22, and VSM 3, are referred to collectively as the "Colombian Assets.")

Debtor Treetop Midstream Services, LLC ("Treetop") and its wholly owned Debtor subsidiaries Antioch Pipeline Company, LLC; BGGCO, LLC; Greenleaf CO2 Solutions, LLC; Highland Colony Capital, LLC; TPCO, LLC; and Xlake Pipeline Company, LLC (collectively, the "Midstream Debtors") are involved in the "midstream" segment of the oil-and-gas industry, which means that their business includes the processing, storing, transporting, and marketing of oil, minerals, and gaseous hydrocarbons that have been extracted and produced by upstream entities such as the Upstream Debtors.

Debtor Top Ten Holdings, LLC ("Top Ten") and its wholly owned Debtor subsidiaries BT Lands, LLC; BXO Lands, LLC; Cohay Conservation Area, LLC; Cohay Wildlife, LLC; Leaf River Land Co., LLC; and WYC Lands, LLC (collectively, the "Real Estate Debtors") primarily own interests in real estate, including surface rights, timber, and field-office facilities in oil-and-gas fields that TOG operates for the Upstream Debtors and other non-affiliated working interest owners.

Tellus Energy, Treetop, and Top Ten are all wholly owned by Tenrgys. The Debtors are generally operationally integrated and their oil and gas assets are operated by TOG, a non-Debtor affiliate of the Debtors.

## B.   Assets and Operations

### 1.   The Upstream Debtors

The Upstream Debtors are involved in the "upstream" segment of the oil-and-gas industry, which means that their business includes the exploration, drilling, and extraction of oil, minerals, and gaseous hydrocarbons, and other activities associated with the initial stages of oil-and-gas production.

By virtue of certain oil and gas leases, most of the Upstream Debtors hold working interests in various oil-and-gas properties in Mississippi and Louisiana. TOG serves as the contract Operator of all of the working interests owned by the Upstream Debtors.

The Upstream Debtors' key fields employ a variety of oil-and-gas recovery techniques, which can be summarized as follows:

(1)   *Primary recovery* – Existing subsurface pressure naturally "pushes" the oil and gas to the wellbore. Oil and gas either naturally flows or is pumped to the surface using artificial lift technologies. Primary recovery typically recovers less than 15% of the original oil in place ("OOIP").

(2)   *Secondary recovery* – By pumping water into the reservoir, additional volumes of oil can be pushed to producing wellbores. Secondary recovery typically recovers an additional 20% to 30% of the OOIP.

(3)   *Tertiary recovery* – By injecting $CO_2$ into the oil reservoirs, additional incremental volumes of the OOIP above primary and secondary recovery can be recovered.

The majority of the Debtors' revenue from upstream production comes from seven fields in Mississippi: (i) West Yellow Creek; (ii) Baxterville; (iii) Raleigh; (iv) Stampede; (v) Tallahala Creek; (vi) Leaf River; and (vii) Trenton. Below is a chart highlighting the contribution of daily production from each of these fields including: (1) actual production from January 2020 through June 2021, and (2) forecasted production thereafter through year-end 2025.



Tellus Energy also owns 100% of the LLC membership interests in its non-Debtor subsidiary Telpico, which hold a 100% interest in, and operating control of, three Colombian oil and gas concessions: Llanos 42, VSM 22, and VSM 3, covering more than 260,000 acres. These concessions are governed and regulated by the Colombian ANH.



Llanos 42 is in the Llanos Basin and lies east of the prolific super giant Cano Limon field:



VSM 22 and VSM 3 are in the prolific Upper Magdalena Basin:





## 2.    The Midstream Debtors

The Midstream Debtors are involved in the "midstream" segment of the oil-and-gas industry, which means that their business includes the processing, storing, transporting, and marketing of oil, minerals, and gaseous hydrocarbons that have been extracted and produced by upstream entities such as the Upstream Debtors. More specifically, the Midstream Debtors provide $CO_2$ pumping and transportation services, reservoir $CO_2$ recycle management, and other natural gas gathering, transportation, and processing services.

Debtor Greenleaf CO2 Solutions, LLC ("Greenleaf") provides $CO_2$ transportation and pumping services for the benefit of the West Yellow Creek field. The $CO_2$ is sourced from a third party via a long-term contract between the third party and TOG. Greenleaf also provides $CO_2$ recycling compression services for produced $CO_2$ at the West Yellow Creek field.

Treetop purchases $CO_2$ under a supply contract with a third party and provides that $CO_2$ in turn to the Raleigh and Stampede fields. Treetop is the contract operator for the $CO_2$ recycle facility servicing the Raleigh and Stampede fields. Treetop is also developing a 126-module membrane skid to separate $CO_2$ and natural gas components from the Raleigh and Stampede produced gas. This $CO_2$ can be injected back into the field, while the natural gas and natural gas liquids components can be used as fuel and/or sold into the market.

Debtor BGGCO, LLC ("BGGCO") owns the gas-gathering and compression system supporting the Debtors' Baxterville field assets. This system consists of approximately 12 miles of low-, intermediate-, and high-pressure trunkline delivery systems. The system also includes

smaller diameter flowlines which gather gas produced from the field's vertical wells. Three compressors located at one active compressor station move the gas through the system.

### 3.      The Real Estate Debtors

The Real Estate Debtors primarily own interests in real estate, including surface rights, timber, and field-office facilities in oil-and-gas fields that TOG operates for the Upstream Debtors and other non-affiliated working interest owners. Land owned by certain of the Real Estate Debtors has also been used for obtaining wetlands mitigation credits or performing wetlands remediation work when required by the United States Corps of Army Engineers.

In general, TOG leases property from the Real Estate Debtors, and TOG's lease expenses are billed *pro rata* to third-party working interest owners in the associated fields. This is an additional source of revenue for the Debtors.

### 4.      Valuation of the Debtors' Assets

FTI Consulting, Inc. ("FTI") has valued the Debtors' domestic oil-and-gas assets, including both oil-and-gas reserves and midstream assets, *excluding* the Colombian Assets (collectively, the "Domestic Assets") between approximately $117,300,000 and $163,700,000 as of September 1, 2021.

Moyes & Co. ("Moyes") has valued Telpico's Colombian Assets between approximately $97,200,000 and $121,200,000 as of August 1, 2021.

### C.      Prepetition Capital Structure

The Debtors have approximately $129 million of funded debt principal (plus accrued interest), under which Tenrgys is the primary borrower, and the other Debtors are guarantors.

### 1.      2012 RBL Facility

Tenrgys entered into a secured credit facility, the Second Amended and Restated Credit Agreement, dated as of August 30, 2012 (as may be amended and restated from time to time, the "2012 RBL Facility"), with Tenrgys as Borrower, Regions Bank as Administrative Agent and LC Issuer, Certain Financial Institutions as Lenders, Regions Capital Markets, a division of Regions Bank, as Sole Lead Arranger and Sole Book Runner, and Capital One, National Association, as Syndication Agent.

The 2012 RBL Facility is a borrowing base revolving credit facility, under which Tenrgys had access to a $125 million line of credit secured by the Debtors' oil and gas reserves.[5] Under the terms of the agreement, the Debtors' reserves were evaluated periodically, and the amount of credit available to Tenrgys was adjusted in accordance with the analysis of the value of the reserves. The borrowing base was subject to adjustment based upon (i) commodity prices and (ii) analysis of the Debtors' oil and gas reserves.

---

[5] The 2012 RBL Facility has matured so the line of credit is no longer available.

The Debtors that owned mineral interests granted deeds of trust covering those mineral interests, and all of the Debtors executed guaranty agreements, as security for the 2012 RBL Facility. 2012 RBL Facility is secured by substantially all of the assets of the Debtors, including Debtor Tellus Energy, LLC's 100% membership interest in its non-Debtor subsidiary Telpico, LLC.

The Second Amended and Restated Credit Agreement dated August 30, 2012 has since been amended by (a) the First Amendment thereto dated December 21, 2012, (b) the Second Amendment thereto dated December 23, 2012, (c) the Third Amendment thereto dated May 21, 2015, (d) the Fourth Amendment thereto dated February 1, 2017, (e) the Fifth Amendment thereto dated April 3, 2017, and (f) the Sixth Amendment thereto dated August 30, 2017. PanAm has alleged that the amount of its secured claim owed under the 2012 RBL Facility is approximately $70 million as of June 30, 2021, comprising approximately $54 million principal and alleged accrued interest.

### 2.    The 2013 Term Loan

Tenrgys entered into a Term Loan Agreement (the "2013 Loan Agreement") dated as of December 23, 2013, with Tenrgys as Borrower, Wilmington Trust, National Association, as Administrative Agent, FS Energy and Power Fund as Lead Lender, and Certain Financial Institutions as Lenders ("2013 Loan"). The original principal amount of the 2013 Term Loan was $75 million. The 2013 Loan is unsecured. The Debtors other than Tenrgys executed guaranty agreements in support of the loan.

On July 5, 2017, FS Energy and Power Fund sold and assigned part of its interest in the 2013 Loan to Foxfields Funding LLC. On May 29, 2019, each of FS Energy and Power Fund and Foxfields Funding LLC sold and assigned its entire interest in the 2013 Loan to FSEP Investments, Inc. From May 29, 2019 forward, FSEP Investments, Inc. has owned all interest in the 2013 Loan. The amount of FSEP Investments, Inc.'s claim owed under the 2013 Loan is approximately $75 million in aggregate principal amount plus all interest, past due and default interest, fees, expenses and charges arising under the terms and conditions of the 2013 Loan and the 2013 Loan Agreement and/or any guaranties related to the 2013 Loan and the 2013 Loan Agreement.

### 3.    LLC Membership Interests

Each of the Debtor LLCs is a manager-managed LLC and has a single class of membership interest that primarily constitutes an economic interest on the part of the holder.

Tenrgys has numerous members. Members do not have governance rights with respect to the Tenrgys, except for the following:

- A vote of 67% of the membership interest (a "67% Membership Interest Act") is required to (i) change or reorganize the Company into any other legal form, (ii) require any Member to make any contribution to the Company not provided for in the Member's contribution agreement, the Company's Certificate of Formation, or the LLC Agreement, (iii) act in contravention of the material terms of the LLC Agreement, (iv) merge or consolidate the Company, (v) sell all or substantially all of the operating assets of the Company, (vi) dissolve the Company, (vii) authorize

the Company to borrow more than $100 million, or (viii) make any single capital expenditure in excess of $100 million;

- A vote of 75% of the membership interest (a "75% Membership Interest Act") is required to amend the LLC Agreement; and

- The Initial Manager may be removed only for good cause shown by (i) 67% Membership Interest Act, if cause is the Initial Manager's conviction of a felony that directly relates to the Company or the Company's assets or business operations, or (ii) a 75% Membership Interest Act, if cause is the Initial Manager's conviction of crimes other than misdemeanors, or is due to a court's final non-appealable determination of the Initial Manager's intentional wrongful acts against the Company.

Tellus Energy, Treetop, and Top Ten are single member LLCs whose sole member is Tenrgys. Each of the Upstream Debtor LLCs (other than Tellus Energy) is a single member LLC whose sole member is Tellus Energy. Each of the Midstream Debtors (other than Treetop) is a single member LLC whose sole member is Treetop. Each of the Real Estate Debtors (other than Top Ten) is a single member LLC whose sole member is Top Ten.

## IV.   OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce the Reorganized Debtors' long-term debt and annual interest payments, resulting in a stronger, de-levered balance sheet for the Reorganized Debtors. As noted above, the Plan provides for: (a) the satisfaction of the Secured 2012 RBL Facility Claim through the Colombian Collateral Tender Transaction; (b) the partial equitization and restructuring of the 2013 Loan Claim; (c) [payment in full of Allowed General Unsecured Claims on the Effective Date or otherwise in the ordinary course of the Debtors' business]; and (d) Exit Financing of up to $5 million on the Effective Date to ensure liquidity and assist in commencing payments under the Plan.

### A.   The Colombian Collateral Tender Transaction

As partial security for the Debtors' indebtedness under the 2012 RBL Facility, PanAm holds security interests in 100% of the LLC membership interests of Telpico, which owns the Colombian Assets. Telpico and its former partners have spent over $100 million performing seismic surveys, conducting geologic reviews, preparing environmental studies, doing mandated social work in local communities, obtaining permits, and routinely obtaining term extensions of the underlying exploration and production contracts to maintain the Colombian Assets. The Llanos 42 and VSM 22 concessions are now "drill ready." The environmental review required for the VSM 3 concession was recently approved by ANLA, the government agency having jurisdiction over oil and gas exploration, paving the way for the routine issuance of a permit for drilling the initial VSM 3 prospect.

The Debtors engaged Moyes & Co. ("Moyes"), which has valued the Colombian Assets between approximately $97,200,000 and $121,200,000 as of August 1, 2021. Additionally, in May 2019, PanAm obtained a geologic and engineering evaluation of the Colombian Assets that was

prepared without the knowledge or involvement of the Debtors. That assessment assigns a "net present value" to Telpico's interest in the Colombian Assets of over $3 billion in the "base case" or "expected scenario," with a "potential upside" value of more than $9.6 billion.

On the Effective Date, the Debtors shall convey to PanAm all of the Debtors' right, title, and interest in and to Telpico and the Colombian Assets in full and complete satisfaction of PanAm's Secured Claim under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

### B.    Treatment of the 2013 Loan Claim

On the Effective Date, the 2013 Loan Claim shall be cancelled, released, and extinguished and will be of no further force and effect, and the Consenting 2013 Loan Lender shall receive, in full and final satisfaction of such Allowed 2013 Loan Claim:

> (i)    Payment of the sum of Five Hundred Thousand Dollars ($500,000.00) in Cash on the Effective Date;

> (ii)    A membership interest equal to ten percent (10.00%) of the equity in the Reorganized Tenrgys; and

> (iii)    a new $40 million floating rate first-lien term loan with market pricing (but with an interest rate of L+650 with a LIBOR floor of 1% if paid in cash, or L+850 with a LIBOR floor of 1% if paid in kind), and other market terms to be agreed and set forth in New Secured Term Loan Documents, consistent with the provisions set forth in the financing term sheet attached to the RSA, in each case acceptable to the Consenting 2013 Loan Lender in form and substance.

### C.    Exit Financing

The Debtors' management may raise up to $5 million in financing in the form of an Exit Facility to be provided to the Reorganized Debtors on the Effective Date, for purposes that include funding payments under the Plan. The Exit Facility will be subordinate to the New Secured Term Loan and any other creditors who are to receive cash payments under the Plan, and will be subject to other terms to be mutually agreed between the Debtors and the Consenting 2013 Loan Lender, and in a form and substance acceptable to the Debtors and the Consenting 2013 Loan Lender.

### D.    Governance

The management and board of directors (if applicable) of the Reorganized Debtors shall remain unchanged. The prepetition LLC Operating Agreements and any other organizational documents of the Debtors shall remain in full force and effect with respect to the Reorganized Debtors, except as and to the extent modified by the Reorganized Equity Documents.

### E.    Recoveries to Claim Holders

All holders of Claims who do not consent to a lesser treatment will be paid the value of their Claims in cash on the Effective Date of the Plan, will have their Claims Reinstated, or will

otherwise receive the indubitable equivalent of their Claims. In this regard, the Consenting 2013 Loan Lender has consented to the treatment of its Claim as set forth in Section IV. .B of this Disclosure Statement, above.

### F.     General Settlement of Claims and Interests

Under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, under Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, Reorganized Tenrgys (or any other party, as determined by the Debtors) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to holders of Claims against, or Interests in, the Debtors or any other party in interest.

### G.     Releases

The Plan contains certain releases (as described more fully in Section V.T of this Disclosure Statement), including mutual releases among each of the following, solely in its capacity as such: (a) each Debtor, (b) each Reorganized Debtor, (c) the Consenting 2013 Loan Lender, (d) any Releasing Party, (e) with respect to each of the foregoing Persons in clauses (a) through (d), each of their affiliates, and (e) with respect to each of the foregoing Persons in clauses (a) through (e), such Person's "Related Parties," in each case in their capacity as such and as hereinafter defined; *provided*, *however*, that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party."

The Plan also provides that (a) the Holders of all Claims or Interests who vote to accept the Plan, (b) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (c) the Holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth therein, (d) the Holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth therein but did not opt out, (e) all other

holders of Claims and Interests to the maximum extent permitted by law, (f) the Consenting 2013 Loan Lender, (f) with respect to each of the foregoing Persons, in clauses (a) through (e), each of their affiliates, and (g) with respect to each of the foregoing persons in clauses (a) through (f), such Person's Related Parties, in each case in their capacity as such will be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged from any and all Causes and Actions and against the Debtors and the Released Parties.

## V.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest Holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the Chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a Chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor, and any other Entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Court approval of the Plan. Before soliciting acceptances of the Plan, Section 1125 of the Bankruptcy Code requires the Debtors to (a) prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan, and (b) share such disclosure statement with all Holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.   Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Deadline described in Article VIII.B. Consistent with Section 1122(a) of the Bankruptcy Code, each category of Holders of Claims or Interests, as set forth in Article III of the Plan, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Secured 2012 RBL Facility Claims | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Unsecured 2013 Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | TOG Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 8 | Intercompany Interests in the Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 9 | Existing Tenrgys Equity Interests | Impaired | Entitled to Vote |

Notwithstanding the status designations in the table above, the Debtors reserve the right to assert at any hearing to approve this Disclosure Statement that the treatment to be provided to Holders of Claims and Interests under Article III.B of the Plan renders such Holders Unimpaired.

### D.   What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[6]**

---

[6] The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions. "Allowed" means with respect to any Claim, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim Filed by the Claims Bar Date or Governmental Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or under a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed under the Plan or a Final Order of the Court; *provided that* with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the

| SUMMARY OF EXPECTED RECOVERIES ON CLAIMS AGAINST THE DEBTORS | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Secured 2012 RBL Facility Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that the Holder of the Allowed Secured 2012 RBL Facility Claims agrees to a less favorable treatment of its Allowed Claims, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Secured 2012 RBL Facility Claims, the Debtors shall, under section 1129(b)(2)(A)(iii) of the Bankruptcy Code (i) convey, transfer, or otherwise assign all of the Debtors' right, title, and interest in and to Telpico to the Holder of the Allowed Secured 2012 RBL Facility Claims; or (ii) alternatively, at the option of the Holder, cause Telpico to convey, transfer, or otherwise assign all of Telpico's right, title, and interest in and to and the Colombian Assets to the Holder of the Allowed Secured 2012 RBL Facility Claims. | $70,000,000 | 100% |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s) (subject to the reasonable consent of the Consenting 2013 Loan Lender, which consent shall not be unreasonably withheld), either: (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Allowed Other Secured Claim, including the retention of such Holder's Liens, or (iii) such Holder will receive such other treatment so as to render such Holder's Allowed Other Secured Claim Unimpaired under section 1124 of the Bankruptcy Code. | [●] | 100% |

Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim or request for payment of an Administrative Claim Filed after the Claims Bar Date or Governmental Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "Allow" and "Allowing" shall have correlative meanings.

| SUMMARY OF EXPECTED RECOVERIES ON CLAIMS AGAINST THE DEBTORS | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the Debtors' option (subject to the reasonable consent of the Consenting 2013 Loan Lender, which consent shall not be unreasonably withheld), either: (i) payment in full in Cash; or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in each case payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as practicably thereafter. | [●] | 100% |
| 4 | Unsecured 2013 Loan Claims | On the Effective Date, except to the extent that the Holder of the Allowed Unsecured 2013 Loan Claim agrees to a less favorable treatment of its Allowed Claim in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Unsecured 2013 Loan Claim, such Holder shall receive: (i) payment of the sum of Five Hundred Thousand Dollars ($500,000.00) in Cash on the Effective Date; (ii) a membership interest equal to ten percent (10.00%) of the equity in the Reorganized Tenrgys; and (iii) a new $40 million floating rate first-lien term loan with market pricing (but with an interest rate of L+650 with a LIBOR floor of 1% if paid in cash, or L+850 with a LIBOR floor of 1% if paid in kind), and other market terms to be agreed and set forth in the New Secured Term Loan Documents. | $114,190,000 | 44% |
| 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each such Holder shall receive, at the Debtors' option, either: (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such Holder's Allowed General Unsecured Claim will be Reinstated, or (iii) such Holder will receive such other treatment so as to render such Holder's Allowed General Unsecured Claim Unimpaired under section 1124 of the Bankruptcy Code. | $219,000 | 100% |
| 6 | TOG Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that the Holder of an Allowed TOG Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed TOG Claim, each such Holder shall be Reinstated. | [●] | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES ON CLAIMS AGAINST THE DEBTORS | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 7 | Intercompany Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Intercompany Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Claim, each such Holder shall be Reinstated. | [●] | [●]% |
| 8 | Intercompany Interests in the Debtors | On the Effective Date, the legal, equitable, and contractual rights to which Intercompany Interests in the Debtors entitle the Holders of such Interests shall remain unaltered. | N/A | 100% |
| 9 | Existing Tenrgys Equity Interests | On the Effective Date, each Holder of an Allowed Existing Equity Interest in Tenrgys on account of such Interest shall receive or retain such Holder's Pro Rata share of 100% of the Reorganized Equity Interests, subject to dilution by the Reorganized Equity Interests to be received by the Holders of the 2013 Loan Claim. | N/A | 100% |

### E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Unless otherwise agreed to by the Holder, each Holder of an Allowed General Administrative Claim will receive, in full and final satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, 120 days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, under the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 2.    Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.B of the Plan, as summarized herein. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim

shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with Sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated in accordance with the terms set forth in Section 1129(a)(9)(D) of the Bankruptcy Code.

**F.      [Are there any regulatory approvals required to consummate the Plan?**

No. There are no known regulatory approvals that are required to consummate the Plan.]

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received under the Plan. For a more detailed description of the consequences of an extended Chapter 11 case, or of a liquidation scenario, *see* Section IX.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 61, and the Liquidation Analysis attached hereto as Exhibit "D."

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. *See* Article IX of this Disclosure Statement, entitled "CONFIRMATION OF THE PLAN," which begins on page 61, for a discussion of the conditions precedent to consummation of the Plan.

In general, and unless otherwise provided in the Plan, each Holder of an Allowed Claim (or such Holder's affiliate) shall receive the full and final amount of the distributions to Holders of Allowed Claims and Interests in each applicable Class on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter).

More detail regarding Plan distributions is set forth in Article VI of the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors shall fund distributions under the Plan with one or more of the following, subject to appropriate definitive agreements and documentation: (1) the Exit Facility; (2) the

Colombian Collateral Tender Transaction; (3) the New Term Loan; (4) the New Reorganized Tenrgys Membership Interests; and (5) encumbered and unencumbered Cash on hand, including Cash from operations of the Debtors. Each distribution and issuance referred to in the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### J.  Are there risks to owning Reorganized Tenrgys Membership Interests upon emergence from Chapter 11?

Yes. *See* Article VII of this Disclosure Statement, entitled "RISK FACTORS," which begins on page 47.

### K.  Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VII.C.8 of this Disclosure Statement, entitled "Reorganized Tenrgys May Be Adversely Affected by Potential Litigation," which begins on page 58.

If it becomes necessary to confirm the Plan over the rejection and/or objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting and/or objecting Classes. The Court may confirm the Plan under the "cramdown" provisions of the Bankruptcy Code, which allow the Court to confirm a plan that has been rejected by an impaired Class if the Court determines that the Plan satisfies Section 1129(b) of the Bankruptcy Code. *See* Article VII.A.5 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan," which begins on page 48.

### L.  Will Royalty and Working Interests be affected by the Plan?

The legal and equitable rights, interests, defenses, and obligations of lessors under the Debtors' oil and gas leases and holders of certain other mineral interests related to the Debtors' oil and gas properties, owners of non-operating working interests in the Debtors' oil and gas properties, counterparties to the Debtors' joint operating agreements, and holders of Claims related to joint-interest billings and other similar working interests shall not be impaired in any manner by the provisions of the Plan, and nothing in the Plan shall impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors. To the extent applicable, such Claims or Interests shall be Reinstated under the Plan.

### M.  Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?

The Debtors estimate that the amount of Allowed General Unsecured Claims could range from approximately $[●] to approximately $[●]. These ranges depend on a number of contingencies, including, among others: (a) whether the Debtors reject any Unexpired Leases or

Executory Contracts; (b) the amount of Claims Filed by Governmental Units; (c) Claims arising from litigation against the Debtors; and (d) the Claims reconciliation process.

Although the estimated ranges of Allowed General Unsecured Claims are the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein. Further, the Debtors may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. Nevertheless, these changes should not affect recoveries to Holders of Claims in Class 5, because the Plan proposes to pay all Allowed General Unsecured Claims in full on the Effective Date.

### N.   What will happen to Executory Contracts and Unexpired Leases under the Plan?

As set forth more fully in Article V of the Plan, all Executory Contracts or Unexpired Leases of the Debtors (including for the avoidance of doubt, the RSA), not previously assumed or rejected under an order of the Bankruptcy Court, will be deemed to be Assumed Executory Contracts or Unexpired Leases, in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) were previously assumed or rejected by the Debtors, under a Final Order of the Court; (2) previously expired or terminated by their own terms or by agreement of the parties thereto, (3) are the subject of a motion to reject filed by the Debtors on or before the date of entry of the Confirmation Order, (4) contain a change of control or similar provision that would be triggered by the Restructuring Transactions (unless such provision has been irrevocably waived), or (5) are specifically designated as contracts or leases to be rejected on the Schedule of Rejected Executory Contracts and Unexpired Leases. **The Debtors do not currently intend to reject any Executory Contracts or Unexpired Leases.**

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease; *provided*, that the Debtors or the Reorganized Debtors, as applicable, and with the consent of the Consenting 2013 Loan Lender, shall work together in good faith to determine which executory contracts and unexpired leases, if any, shall be assumed, assumed and assigned, or rejected.

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, as reflected on a Cure Notice, shall be satisfied, under Section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described in Article V.C of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least fourteen (14) days before the Confirmation Hearing, the Debtors will provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related**

**cure amount must be Filed, served, and <u>actually</u> <u>received</u> by 4:00 p.m. (prevailing Central Time) on or before 7 days before the Confirmation Hearing.** In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date. After such Executory Contract or Unexpired Lease is added to the Schedule of Rejected Executory Contracts and Unexpired Leases, the respective contract counterparty shall be served with a notice of rejection of Executory Contracts and Unexpired Leases.

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be promptly served with a notice of rejection of Executory Contracts and Unexpired Leases. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, under the Plan or the Confirmation Order, if any, must be Filed within 30 days after the later of: (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (2) the effective date of such rejection. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims, and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan. All notices of rejection of Executory Contracts and Unexpired Leases shall include the deadlines for filing Proofs of Claim for rejection damages.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

### O.     How will Claims asserted with respect to rejection damages affect my recovery under the Plan?

The Debtors estimate that the amount of Allowed General Unsecured Claims could range from approximately $[●] to approximately $[●]. The Debtors do not currently anticipate that there will be any Claims arising from the Debtors' rejection of Executory Contracts or Unexpired Leases. Even if the Debtors hereafter determine to reject one or more Executory Contracts or Unexpired Leases, the value of recoveries to Holders of Claims in Class 5 should remain unchanged. For more information about impacts to recoveries, please see Article V.M of this Disclosure Statement, entitled "Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?"

### P.     How will Governmental Claims affect my recovery under the Plan?

The Debtors estimate that there will be a *de minimis* amount of Government Claims not covered by their First Day Motions, if any. Regardless of the actual amount of General Unsecured

Claims from Governmental Units, the value of recoveries to Holders of Claims in Class 5 should remain unchanged. For more information about impacts to recoveries, please see Article V.M of this Disclosure Statement, entitled "Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?"

**Q.    How will the resolution of certain contingent, unliquidated, and disputed litigation Claims affect my recovery under the Plan?**

The Debtors estimate that the amount of Allowed General Unsecured Claims could range from approximately $[●] to approximately $[●]. These amounts do not include any estimates for contingent, unliquidated, or disputed litigation Claims known to the Debtors as of the date hereof, which generally are considered General Unsecured Claims. As of the Petition Date, certain of the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses, and the Reorganized Debtors could become parties to additional litigation in the future as a result of conduct alleged to have occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately determined to be entitled to payment from any of the Debtors, the Reorganized Debtors shall satisfy such liquidated obligations as they become due, and the value of recoveries to Holders of Claims in Class 5 should remain unchanged. For more information about impacts to recoveries, please see Article V.M of this Disclosure Statement, entitled "Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?"

**R.    What happens to contingent, unliquidated, and disputed Claims under the Plan?**

As set forth in more detail in Article VII of the Plan, after the Effective Date, the applicable Reorganized Debtor(s) shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (2) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

In addition, before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated under Section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under

the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.A and VII.B of the Plan, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

### S.    How will the preservation of the Causes of Action impact my recovery under the Plan?

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with Section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, Article IV.L, the last sentence of the first paragraph of Article IV.K of the Plan, and Article VI.B of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to their Estates, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors under the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under Sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent-transfer law; *provided, however*, that in no event shall any Cause of Action against the Consenting 2013 Loan Lender or its Related Parties be preserved.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or in a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation; *provided, however*, that in no event shall any Cause of Action against the Consenting 2013 Loan Lender or its Related Parties be preserved.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or under the Plan. In accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to

judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**T.    How will the release of Avoidance Actions affect my recovery under the Plan?**

On the Effective Date, the Debtors, on behalf of themselves and their estates, shall release any and all Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under Chapter 5 of the Bankruptcy Code, including Sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code (collectively, "Avoidance Actions") and the Debtors and Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except (i) for Avoidance Actions commenced prior to the Confirmation Date, (ii) for Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors, and (iii) to the extent otherwise reserved in the Plan Supplement. No Avoidance Actions shall revert to creditors of the Debtors.

**U.    Are the Debtors assuming any indemnification obligations for their current officers and directors under the Plan?**

Yes. As set forth more fully in Article V.D of the Plan, the Debtors and Reorganized Debtors will assume each of the Debtors' Indemnification Obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the current and former officers, directors, managers, members, agents, or employees of the Debtors who served in such capacity at any time in their capacities as such, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way. The Indemnification Obligations assumed under the Plan do not include, however, any indemnification obligations arising under the D&O Liability Insurance Policies, which obligations shall not be discharged, impaired, or otherwise modified in connection with Confirmation of the Plan.

**V.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes. The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the Consenting 2013 Loan Lender in obtaining its support for the Plan. All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Each Holder of a Claim or Interest that (1) votes to accept or is deemed to accept the Plan or (2) is in a voting Class that abstains from voting on the Plan but does not elect to opt out of

the release provisions contained in Article VIII of the Plan will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. In other words, Holders of Claims or Interests that vote against the Plan automatically are deemed to refuse to grant these releases. A Holder of Claims or Interests in a voting Class who abstains from voting and returns its ballot may choose to opt out of granting the releases on its ballot. The releases represent an integral element of the Plan.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied below:

"**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting 2013 Loan Lender; (d) any statutory committee appointed in the Chapter 11 Cases and each of such committee's members; and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Person's affiliates; and (f) with respect to each of the foregoing Persons in clauses (a) through (e), such Person's Related Parties, in each case in their capacity as such.

"**Released Parties**" means, collectively, (a) the Debtors, (b) the Reorganized Debtors, (c) the Consenting 2013 Loan Lender, (d) any Releasing Party, (e) with respect to each of the foregoing Persons, in clauses (a) through (d), each of their affiliates, and (f) with respect to each of the foregoing Persons in clauses (a) through (e), such Person's Related Parties, in each case in their capacity as such; *provided* that any Holder of a Claim or Interest that validly opts out of the releases contained in the Plan or validly objects to the releases contained in the Plan and subjection is not resolved by the entry of the Confirmation Order shall not be a "Released Party."

"**Releasing Parties**" means, collectively, (a) the holders of all Claims or Interests who vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth therein, (d) the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth therein but did not opt out, (e) all other holders of Claims and Interests to the maximum extent permitted by law, (f) the Consenting 2013 Loan Lender, (f) with respect to each of the foregoing Persons, in clauses (a) through (e), each of their affiliates, and (g) with respect to each of the foregoing Persons in clauses (a) through (f), such Person's Related Parties, in each case in their capacity as such; *provided* that any Holder of a Claim or Interest that validly opts out of the releases contained in the Plan or validly objects to the releases contained in the Plan and such objection is not resolved by the entry of the Confirmation Order shall not be a "Releasing Party."

1.        **Releases by the Debtors.**

Notwithstanding anything contained herein to the contrary, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, under section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed, contingent or noncontingent, pending or threatened, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any avoidance actions, intercompany transactions between or among a Debtor or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into or filing of the RSA, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Definitive Documents, or any aspect of the Restructuring Transactions, including any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Plan, or the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence, in each case, taking place on or before the Plan Effective Date related or relating to any of the foregoing. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of any current employee of the Debtors

under any employment agreement or plan, (iv) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (v) the rights of holders of Allowed Claims or Interests to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing Debtor release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the foregoing Debtor release; (c) in the best interests of the Debtors and their Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the foregoing Debtor release.

## 2.       Releases by the holders of Claims and Interests.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and all of the Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed, contingent or noncontingent, pending or threatened, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into or filing of the RSA, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Definitive Documents, or any aspect of the Restructuring Transactions, including any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Plan, or the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence, in

each case, taking place on or before the Plan Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of any current employee of the Debtors under any employment agreement or plan, (iv) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (v) the rights of holders of Allowed Claims or Interests to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

### 3.  Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, filing or termination of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any transaction related to the Restructuring Transactions, any contract, instrument, release or other agreement or document created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising under chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### W.     What impact does the Claims Bar Date have on my Claim?

On September [●], 2021, the Debtors Filed their schedules of assets and liabilities and statement of financial affairs with the Court under Section 521 of the Bankruptcy Code (collectively, the "Schedules"). The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be filed in a Chapter 11 case.

The Court has established [●], 2021 as the claims bar date (the "<u>Claims Bar Date</u>") in the Chapter 11 Cases. The bar date for Claims held by Governmental Units is [●], 2021 (the "Governmental Bar Date"). The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) before the Petition Date, including without limitation, Class 5 General Unsecured Claims, are required to Proofs of Claim on or before the Claims Bar Date: (1) any Entity whose Claim against a Debtor is not listed in the applicable Debtor's Schedules or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such Entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any Entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim allowed in a different classification or amount from that identified in the Schedules; (3) any Entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim allowed against a Debtor other than that identified in the Schedules; and (4) any Entity that believes its Claim against a Debtor is or may be an administrative expense under Section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under Section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), if any person or Entity that is required, but failed, to File a Proof of Claim on or before the Claims Bar Date, except in the case of certain exceptions explicitly set forth in order setting the Claims Bar Date and the Governmental Bar Date (the "Bar Date Order") or by further order of the Court, such person or Entity will be: (1) barred from asserting such Claims against the Debtors in these Chapter 11 Cases; (2) precluded from voting on any plans of reorganization Filed in these Chapter 11 Cases; and (3) precluded from receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases. Notwithstanding the foregoing, a Holder of a Claim shall be able to assert, vote upon, and receive distributions under the Plan, or any other plan of reorganization or liquidation in the Chapter 11 Cases, to the extent, and in such amount, as any undisputed, non-contingent, and liquidated Claims identified in the Schedules on behalf of such Claim Holder.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which Proofs of Claim are Filed on or before the Claims Bar Date.

### X.     What is the deadline to vote on the Plan?

The Voting Deadline is [●], 2021, at 4:00 p.m. (prevailing Central Time).

**Y.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by [●], 2021, at 4:00 p.m. (prevailing Central Time) at the following address: Copeland, Cook, Taylor & Bush, P.A., Attn: Christopher H. Meredith, P.O. Box 6020, Ridgeland, Mississippi 39158. Ballots may not be transmitted by facsimile, email, or other electronic means. *See* Article VIII of this Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES," which begins on page 59.

**Z.    Why is the Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**AA.    When is the Confirmation Hearing set to occur?**

The Court has scheduled the Confirmation Hearing for [●], 2021, at [9:00 a.m.] (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be Filed and served on the Debtors, and certain other parties, by no later than [●], 2021, at [4:00] p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as Exhibit "C" and incorporated herein by reference.

**BB.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest Holder of a debtor, and any other person or Entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**CC.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under Chapter 11 of the Bankruptcy Code and subsequently certain of the Reorganized Equity Documents may be amended or amended and restated, in each case with the consent of the Consenting 2013 Loan Lender. As a result, the occurrence of the Effective Date means that the Debtors will not be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors, in consultation with the Consenting 2013 Loan Lender, that is the first business day after which all conditions to Consummation have been satisfied or waived. *See*

Article IX of the Plan. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

> **DD. Will any party have significant influence over the corporate governance and operations of Reorganized Tenrgys?**

As of the Effective Date and subject to any terms within the Reorganized Equity Documents or otherwise, the terms of the current members of the Board of Directors of Tenrgys shall expire, and the terms of the directors, and the initial Reorganized Tenrgys Board shall be constituted and will include:

> **Reorganized Tenrgys Manager and Director**
> Richard H. Mills, Jr.
>
> **Reorganized Tenrgys Board of Directors**
> Robert Roy Ward
> Catherine C. Wohner
> Walter P. Neely
> Hans H. Krause
> James R. McBride
> James "Bobo" Clarke (alternate)
>
> **Manager of Reorganized Debtors (other than Jurassic Seismic Company)**
> Richard H. Mills, Jr.
>
> **Reorganized Jurassic Seismic Company Board of Directors**
> Richard H. Mills, Jr.
> Mike Pumphrey
> Thomas E. Wofford
>
> **President of Reorganized Jurassic Seismic Company**
> Michael Mills

Under Section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any other person proposed to serve on the initial board of directors or be an officer or director of any of the Reorganized Debtors. To the extent any such director or officer of Reorganized Tenrgys is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Each such director and officer shall serve from and after the Effective Date under the terms of the New Organizational Documents.

**EE.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' attorneys:

*By regular mail, hand delivery, or overnight mail at:*
Copeland, Cook, Taylor & Bush, P.A.
Attn: Christopher H. Meredith
P.O. Box 6020
Ridgeland, Mississippi  39158

*By electronic mail at:*
cmeredith@cctb.com

*By telephone at:*
(601) 427-1343

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Debtors' attorneys at the address above or by downloading the exhibits and documents from the Court's website at https://ecf.mssb.uscourts.gov/ (for a fee).

**FF.    Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from Chapter 11 expeditiously, is in the best interest of all Holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**GG.    Who Supports the Plan?**

The Plan is supported by the Debtors, TOG, and, subject to the terms and conditions of the RSA, the Consenting 2013 Loan Lender, as set forth in the following chart:

| Consenting Parties | Support (expressed as an approximate percentage of the total principal amount of claims outstanding) |
|---|---|
| Debtors | 100% |
| TOG | 100% |
| The Consenting 2013 Loan Lender | 100% |

## VI.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from Chapter 11 by [•] 2021. **No assurances can be made, however, that the Court will enter various orders on the timetable anticipated by the Debtors.**

### B.   First Day Relief

On the Petition Date, along with their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, ensuring that the Debtors would continue to satisfy their ordinary-course obligations without interruption, and easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. On September 21, 2021, the Court entered orders approving the First Day Motions on either an interim or final basis. A final hearing to approve certain of the First Day Motions was held on October 20 [and 21], 2021.

### C.   Proposed Case Timeline

As part of the RSA, the Debtors agreed to the following case milestones to ensure that the Debtors' Chapter 11 Cases proceed in a structured and expeditious manner towards confirmation:

- No later than September 17, 2021, the Company Parties shall have commenced the Chapter 11 Cases;

- No later than November 10, 2021, the Bankruptcy Court shall have entered the Disclosure Statement Order;

- No later than December 15, 2021, the Bankruptcy Court shall have entered the Confirmation Order; and

- No later than January 14, 2021, the Effective Date shall have occurred.

### D.   Other Procedural and Administrative Motions

*[TO COME]*

### E.   Retention of Professionals

The Debtors filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Copeland, Cook, Taylor & Bush, P.A. as counsel (Dkt. # •);

- FTI Consulting, Inc., as financial advisor (Dkt. # •);

- Moyes & Co., as appraiser (Dkt. # •); and

- Weil, Gotshal & Manges LLP as counsel (Dkt. # •)

### F.    Other Litigation Matters

In the ordinary course of business, certain of the Debtors are party to certain lawsuits, legal proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

Following commencement of the Chapter 11 Cases, certain litigation counterparties may File in the future, requests to modify or lift the automatic stay to continue pursuing their prepetition litigation against the Debtors. The Debtors will evaluate all such requests for relief from the automatic stay on a case-by-case basis and object or resolve on a consensual basis, as appropriate.

### G.    Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into certain Executory Contracts and Unexpired Leases, including the RSA. The Debtors, with the assistance of their advisors, are reviewing the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject under sections 365 or 1123 of the Bankruptcy Code. The Plan Supplement will include information regarding the assumption or rejection of the remaining Executory Contracts and Unexpired Leases. Any Executory Contracts or Unexpired Leases not addressed during the Chapter 11 Cases will be treated in accordance with Article V of the Plan. The Debtors do not currently expect to reject any contracts or leases.

## VII.   RISK FACTORS

Holders of Claims should read and carefully consider the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.  Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.  There Is a Risk of Termination of the RSA

To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by an important creditor constituency. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### 2.  Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

### 3.  The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

### 4.  The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan or sale under section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 5.  The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (a) such plan

"does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the RSA reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 6.     Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7.      Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their oil and natural gas, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon Filing their Petitions. If the Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 8.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

Further, conversion to a case under chapter 7 is a Consenting 2013 Loan Lender Termination Event, as that term is defined in the RSA. Occurrence of a Consenting 2013 Loan Lender Termination Event entitles, but does not require, the Consenting 2013 Loan Lender to terminate the RSA (as more fully set forth therein). The Debtors anticipate that the Consenting 2013 Loan Lender would exercise its termination rights under the RSA if the Chapter 11 Cases converted to cases under chapter 7 of the Bankruptcy Code.

9.      **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10.     **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement and the RSA shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holder of a Claim or Interest or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

11.     **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

12.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be

approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and the Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to certain Plan consideration, but only if they receive the benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

## B. Risks Related to Recoveries under the Plan

### 1. The Debtors May Not Be Able to Achieve their Projected Financial Results

Reorganized Tenrgys may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of Reorganized Tenrgys's operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. Certain Holders of Equity Issued Under the Plan May Be Restricted in their Ability to Transfer or Sell their Securities

To the extent that the Tenrgys membership interests issued under the Plan are covered by section 1145(a) of the Bankruptcy Code, and to the extent permitted under the LLC Agreement, the membership interests may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, such interests will not be freely tradable if, at the time of transfer, the Holder is an "affiliate" of Reorganized Tenrgys as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Persons who receive membership interests in Reorganized Tenrgys under the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

Membership interests in Reorganized Tenrgys will not be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of such interests to freely resell such interests. *See* Article X to this Disclosure Statement, entitled "TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS," which begins on page 65.

### 3.      Certain Securities Law Implications of the Plan

Holders of Allowed Claims should carefully review Article X to this Disclosure Statement, entitled "TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS," which begins on page 65.

### 4.      The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C.      Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1.      The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, anticipated borrowings under the Exit Facility upon emergence.

2.    **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, royalty interest Holders, working interest Holders, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.    **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Furthermore, the Debtors cannot predict the ultimate

amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection. Further, if the Chapter 11 Cases last longer than anticipated, the Debtors may require debtor-in-possession financing to fund the Debtors' operations and these Chapter 11 Cases. If the Debtors are unable to obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans under a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 5. The Debtors' Substantial Liquidity Needs May Impact Production Levels and Revenue

The Debtors' principal sources of liquidity historically have been cash flow from operations, sales of oil and natural gas properties and borrowings under the 2012 RBL Facility. If the Debtors' cash flow from operations decreases as a result of lower commodity prices or otherwise, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage, or maintain current production may be limited, resulting in decreased production and proved reserves over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) ability to comply with the terms and conditions of any cash collateral order entered by the Court in connection with the Chapter 11 Cases; (b) ability to maintain adequate cash on hand; (c) ability to generate cash flow from operations; (d) ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.

### 6. Oil and Natural Gas Prices Are Volatile, and Decreases in Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices. Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand. Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- the impact of global and/or regional health pandemic (including without limitation COVID-19 and its related variants);

- the actions of certain foreign countries;

- the price and quantity of imports of foreign oil and natural gas;

- political conditions, including embargoes, war, or civil unrest in or affecting other oil-producing activities of certain countries;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil and natural gas inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries ("OPEC");

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

Oil and natural gas prices affect the amount of cash flow available to the Debtors to meet their financial commitments and fund capital expenditures. Oil and natural gas prices also impact the Debtors' ability to borrow money and raise additional capital. Lower oil and natural gas prices may not only decrease the Debtors' revenues on a per-unit basis, but also may reduce the amount of oil and natural gas that the Debtors can produce economically in the future. Higher operating costs associated with any of the Debtors' oil or natural gas fields will make their profitability more sensitive to oil or natural gas price declines. A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures. In addition, a sustained decline in oil or natural gas prices might result in substantial downward estimates of the Debtors' proved reserves. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

7. **Drilling for and Producing Oil and Natural Gas Are High Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Business, Financial Condition and Results of Operations**

The Debtors' future success will depend on, among other things, the success of their development and production activities. The Debtors' decisions to purchase, develop, or exploit properties will depend in part on the evaluation of data obtained through geophysical and geological analysis, production data, and engineering studies, the results of which are often inconclusive or subject to varying interpretations. The Debtors' costs of drilling and operating wells are often uncertain before drilling commences. Overruns in budgeted expenditures are common risks that can make a particular project uneconomical. Further, the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures could be materially and adversely affected by any factor that may curtail, delay, or cancel drilling, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;

- unusual or unexpected geological formations;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment and qualified personnel;

- equipment malfunctions, failures, or accidents;

- unexpected operational events and drilling conditions;

- pipe or cement failures;

- casing collapses;

- lost or damaged oilfield drilling and service tools;

- loss of drilling fluid circulation;

- uncontrollable flows of oil, natural gas, and fluids;

- fires and natural disasters;

- environmental hazards, such as natural gas leaks, oil spills, pipeline ruptures, and discharges of toxic gases;

- adverse weather conditions;

- decreases in oil and natural gas prices;

- oil and natural gas property title problems; and

- market limitations for oil and natural gas.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their revenue and profitability.

### 8. The Reorganized Debtor May Be Adversely Affected by Potential Litigation

In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation, but the impact of any such litigation on the Reorganized Debtors' businesses and financial stability could be material.

9. **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on TOG management and personnel, as TOG operates substantially all of the Debtors' businesses. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for TOG personnel and Treetop employees. As a result, the Debtors and TOG may experience increased levels of attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors and TOG may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

10. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' Filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized Entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## VIII. SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as Exhibit "C."

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.***

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.** PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.  Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims against a debtor are entitled to vote on a chapter 11 plan. The table in section V.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 26, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 1, 4, and 9 (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 2, 3, 5, 6, 7, or 8. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.  Voting on the Plan

**The Voting Deadline is [•], 2021, at 4:00 p.m. (prevailing Central Time)**. In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are actually received by the Debtors' counsel on or before the Voting Deadline at the following address:

**DELIVERY OF BALLOTS**

**Christopher H. Meredith**
**Counsel for Tenrgys, LLC**
**1076 Highland Colony Parkway**
**600 Concourse, Suite 200**
**Ridgeland, Mississippi  39157**

If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a ballot before the Voting Deadline.

### C.  Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means other than as specifically set forth in the ballots; (3) it was cast by an Entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' Schedules as contingent, unliquidated, or disputed for which the applicable Claims bar date has passed and no Proof of Claim was timely Filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Deadline

(unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Debtors' counsel named above), an indenture trustee, or the Debtors' financial or legal advisors; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE DEBTORS' COUNSEL AT 601-427-1343.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

## IX.   CONFIRMATION OF THE PLAN

### A.   Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan under section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

If any Parties intend to seek discovery in connection with Confirmation of the Plan, such Parties are encouraged to seek such discovery as soon as possible, because (1) there is no guarantee that there will be sufficient funds to finance the Chapter 11 Cases if the Confirmation Hearing is delayed due to protracted Plan discovery and (2) a protracted discovery timeline likely would cause the Debtors to breach certain milestones in the RSA. There can be no guarantee the Consenting 2013 Loan Lender will continue to support the Plan, or any other plan of reorganization, in that scenario. Further, if this happens, the Debtors may be forced to liquidate, resulting in zero to very low recoveries for all stakeholders.

### B.   Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the Debtors liquidated under chapter 7.

Attached hereto as Exhibit "D" and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of FTI Consulting, Inc., the Debtors' financial advisor. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated under the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the Reorganized Tenrgys membership interests to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

Further, conversion to a case under chapter 7 is a Consenting 2013 Loan Lender Termination Event, as that term is defined in the RSA. Occurrence of a Consenting 2013 Loan Lender Termination Event entitles, but does not require, the Consenting 2013 Loan Lender to terminate the RSA (as more fully set forth therein). The Debtors anticipate that the Consenting 2013 Loan Lender would exercise its termination rights under the RSA if the Chapter 11 Cases converted to cases under chapter 7 of the Bankruptcy Code or if the Debtors fail to obtain Confirmation of the Plan and are forced to pursue a plan of liquidation.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of FTI, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared a projected consolidated income statement, which includes the following: (a) the Debtors' consolidated, unaudited, preliminary, financial statement information for the fiscal year ended December 31, 2021 and (b) consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning 2022 and continuing through 2026. The Financial Projections are based on an assumed Effective Date of January 14, 2022 and certain assumptions regarding the Debtors' ability to obtain Exit Financing. To the extent that the Effective Date occurs before or after January 14, 2022, recoveries on account of Allowed Claims

could be impacted. Creditors and other interested parties should review Article VII of this Disclosure Statement, entitled "RISK FACTORS," which begins on page 47, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as Exhibit "E" and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[7]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.  Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Under section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

---

[7] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### 1.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will consider a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan under section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.      The Plan Supplement

The Debtors will File certain documents that provide additional details regarding implementation of the Plan in the Plan Supplement, which will be Filed with the Bankruptcy Court no later than fourteen Business Days before the Confirmation Hearing (or such later date as may be approved by the Bankruptcy Court). The Debtors will serve a notice that will inform all parties that the Plan Supplement was Filed, list the information included therein, and explain how copies of the Plan Supplement may be obtained. Holders of Claims and Interests that are eligible to vote to accept or reject the Plan shall not be entitled to change their vote based on the contents of the Plan Supplement. It is anticipated that the Plan Supplement will include:

- the Assumed Executory Contract and Unexpired Lease List;

- the Rejected Executory Contract and Unexpired Lease List;

- a list of retained Causes of Action;

- the New Secured Term Loan Documents;

- [Reorganized Equity Documents];and

- the Exit Facility Documents.

## X.   TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

### A.   New Reorganized Tenrgys Membership Interests

As discussed herein, the Plan provides for Reorganized Tenrgys to distribute New Reorganized Tenrgys Membership Interests to the Consenting 2013 Loan Lender as the Holder of the Allowed Unsecured 2013 Loan Claims, and to assign all of the membership interest in Telpico to PanAm as the Holder of the Allowed 2012 RBL Facility Claims. Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.

In reliance upon this exemption, the issuance and distribution of the New Reorganized Tenrgys Membership Interests to the Consenting 2013 Loan Lender and the assignment of 100% of the membership interest in Telpico to PanAm under the Plan shall be exempt, under section 1145 of the Bankruptcy Code, without further act or action by any Person, from registration under (i) the Securities Act and (ii) any applicable state or local law requiring registration for the issuance or distribution of securities. The Telpico membership interest likely may be resold without registration under the Securities Act or other federal securities laws under the exemption provided by section 4(a) (1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. Such Securities that are exempt under section 1145 generally also likely may be resold without registration under state securities laws under various exemptions provided by the respective laws of the several states.

The New Reorganized Tenrgys Membership Interests are subject to transfer restrictions set forth in the Tenrgys Amended and Restated Limited Liability Company Agreement dated March 22, 2013.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

The term "control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor

who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

**Notwithstanding the foregoing, controlling person statutory underwriters may be able to sell securities without registration under the resale limitations of Rule 144 under the Securities Act, which permits the resale of securities received by such statutory underwriters under a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144.**

Upon the Effective Date, the Reorganized Debtors anticipate that they will continue not to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a)–78(pp).

BECAUSE OF THE COMPLEX SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE, AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## XI.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, Reorganized Debtors, and certain Holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the new common equity as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to- market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B.      Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors

All of Tenrgys's Debtor subsidiaries are treated as disregarded entities for U.S. federal income tax purposes (collectively, the "Disregarded Subsidiaries"). As a partnership or disregarded entity (*i.e.*, a "pass-through entity"), Tenrgys and Disregarded Subsidiaries are not themselves subject to U.S. federal income tax. Instead, each holder of a partnership's membership interests (referred to herein as an "Existing Member") is required to report on its U.S. federal income tax return, and is subject to tax in respect of, its distributive share of each item of taxable income, gain, loss, deduction and credit of the Debtors. Accordingly, the U.S. federal income tax consequences of the Restructuring Transactions contemplated by the Plan generally will not be borne by the Debtors, but instead will be borne by the Existing Members.

In connection with the implementation of the Plan, it is possible that a portion of a Claim could be viewed as cancelled for U.S. federal income tax purposes. As a result, the Debtors may incur cancellation of debt ("COD") income in the amount of such deemed cancelled Claims (or portions thereof). As described above, because Tenrgys and Disregarded Subsidiaries are pass-through entities for U.S. federal income tax purposes, any such COD income will be allocated to the Existing Members. Certain statutory or judicial exceptions potentially can apply to limit the amount of COD income required to be included in income by the Existing Members, depending on such members' particular circumstances. In particular, exceptions are available that would allow COD income to be excluded from gross income if the COD income is taken into account by a taxpayer that is insolvent (but only to the extent of insolvency) or in bankruptcy. These exceptions apply at the "partner" level and thus depend on whether the partner, *i.e.,* the Existing Member to whom the COD income was allocated, is itself insolvent or in bankruptcy. The fact that the Debtors are insolvent and in bankruptcy is not relevant for that purpose. For purposes of determining an Existing Member's insolvency (measured immediately prior to the Effective Date), the holder would be treated as if it were individually liable for an amount of partnership debt equal to the allocated amount of the COD income. To the extent any amount of COD income is excludable by an Existing Member by reason of the insolvency or bankruptcy exception, the holder generally would be required to reduce certain tax attributes (such as net operating losses, tax credits, possibly tax basis in assets and passive losses) after the determination of its tax liability for the taxable year. An Existing Member's adjusted tax basis in its membership interest will be increased to the extent of any COD income allocated to such Existing Member.

For U.S. federal income tax purposes the cancellation of any Debtors indebtedness under the Plan will result in a deemed cash distribution to each Existing Member based on the amount of the indebtedness allocable to such Existing Member's membership interest. In addition, a reduction in an Existing Member's allocable share of the Debtors indebtedness will result in a deemed cash distribution. To the extent that any such deemed cash distribution exceeds an Existing Member's adjusted tax basis in its membership interest (after adjustment for COD income and net gain or loss allocable to such Existing Member as described above), such Existing Member will recognize capital gain, subject to certain recapture provisions. Any such capital gain generally should be long-term if such Existing Member's holding period in its membership interest is more than one year. An Existing Member's adjusted tax basis in its membership interest will be decreased (but not below zero) to the extent of any such deemed cash distribution. Significantly, although Existing Members will be deemed for U.S. federal income tax purposes to

receive a cash distribution as a result of any cancelled indebtedness, a cash distribution is not expected to be made to the Existing Members.

To the extent an Existing Member was allocated losses in prior taxable years, such losses may have been suspended by reason of certain provisions of the Tax Code (in particular, those relating to so-called "passive losses" or the "at risk" rules). Additionally, an Existing Member may have been allocated certain interest expense in respect of which a deduction was disallowed by reason of Section 163(j) of the Tax Code. As a result of any deemed cancellation and the recognition of COD income, all or part of such losses or disallowed interest expense may become deductible.

The transfer of the Telpico membership interests to PanAm will be treated as a taxable transaction. Because Tenrgys and its Disregarded Subsidiaries are treated as pass-through entities for U.S. federal income tax purposes, such gain or loss will be allocated to the Existing Members. The Existing Members are urged to consult their tax advisors regarding the impact based on their individual circumstances. An Existing Member's adjusted tax basis in its membership interest will be increased to the extent of any net gain allocated to such member and decreased (but not below zero) to the extent of any net loss allocated to such member.

The Plan also provides that as part of the Restructuring Transactions, the Consenting 2013 Loan Lender will receive the New Reorganized Tenrgys Membership Interests. It is not known at this time if there will be any income tax consequences related to that transaction.

## C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

### 1.      U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Against the Debtors.

Under the Plan, the U.S. Holders of Allowed Claims shall receive a distribution of consideration of a kind described elsewhere in this Disclosure Statement. U.S. Holders of Allowed Claims should be treated as exchanging such Claim for the applicable consideration in a taxable exchange under section 1001 of the Tax Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the sum of (a) Cash, (b) the fair market value of any property other than debt, and (c) the issue price of any debt received in exchange for the Claim; and (2) such U.S. Holder's adjusted basis, if any, in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. A U.S. Holder's tax basis in its Pro Rata share of property other than debt received should equal the fair market value of such property, and a U.S. Holder's tax basis in its Pro Rata share of debt should equal the issue price of such debt as of the

Effective Date. A U.S. Holder's holding period for its Pro Rata share of any non-cash consideration should begin on the day following the Effective Date.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 2.    Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocated of the consideration received by them.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 3.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining

payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax- free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 4. Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 5. Determination of Issue Price for Exit Facility and Reorganized Tenrgys

As noted above, Holders of Unsecured 2013 Loan Claims will receive debt of the Reorganized Debtors in partial satisfaction of their Claims. In each case, the amount of gain or loss recognized by U.S. Holders of such Claims will be determined, in part, by the issue price of a U.S. Holder's Pro Rata share of the new debt received. The determine of "issue price" for purposes of this analysis will depend, in part, on whether the new debt is traded on an established market for U.S. federal income tax purposes. The issue price of a debt instrument that is traded on an established market (or that is issued for Claims against the Debtors that are so traded) would be the fair market value of such debt instrument (or the Claims so traded, if the new debt instrument is not traded) on the Effective Date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for Claims would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). New debt instruments (or Claims against the Debtors) may be traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes with respect to such new debt or Claims.

Although not free from doubt, the Debtors believe it is unlikely that the Claims against the Debtors and/or the new debt instruments being issued will be traded on an established market for these purposes. As a result, the issue price of the new debt instruments being issued will likely equal the stated redemption price at maturity and such debt instruments will not be traded as issued with original issue discount ("OID").

Where debt instruments are treated as being issued with OID, a U.S. Holder of such debt instrument will generally be required to include any OID in income over the term of such debt instrument in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when such U.S. Holder received cash payments of interest on such debt instrument (other than cash attributable to qualified stated interest, which is includible in income in accordance with the U.S Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the U.S. Holder in its interest in such debt instrument. A U.S. Holder of an interest in such new debt instruments will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such debt instruments by the amount of such payments.

In general, interest (including OID) received or accrued by U.S. Holders should be treated as ordinary income.

### 6.      U.S. Federal Income Tax Consequences to PanAm

PanAm's receipt of the membership interests of Telpico will generally be taxed as described in 1 above. With respect to Telpico, there are certain tax elections which may be favorable to PanAm and which should be discussed with their tax advisor.

### 7.      U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Reorganized Tenrgys Membership Interests.

#### (a)      Distributions on Reorganized Tenrgys Membership Interests.

If Reorganized Tenrgys elects to be taxed as a partnership, any distributions made on account of Reorganized Tenrgys membership interests will be taxable for U.S. federal income tax purposes to the extent they exceed the member's current adjusted tax basis in their Reorganized Tenrgys Membership Interest as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that do not exceed their adjusted tax basis, such distributions will be treated as a non-taxable return of capital reducing the U.S. Holder's adjusted tax basis in its interest. Any such distributions in excess of the Holder's adjusted tax basis in its interests generally should be treated as capital gain.

If Reorganized Tenrgys elects to be taxed as a corporation, any distributions made on account of Reorganized Tenrgys membership interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Tenrgys as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal

income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its interests. Any such distributions in excess of the Holder's basis in its interests generally should be treated as capital gain.

Distributions paid to U.S. Holders that are corporations generally should be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a U.S. Holder has held its interests is reduced for any period during which the Holder's risk of loss with respect to the interests is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the interests on which the distribution is paid, all or a portion of the dividends received deduction may be disallowed.

### (b) Sale, Redemption, or Repurchase of Reorganized Tenrgys Membership Interests if Reorganized Tenrgys Elects to be Taxed as a Corporation

If Reorganized Tenrgys elects to be taxed as a partnership, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of Reorganized Tenrgys membership interests, subject to certain recapture provisions that may apply. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the interests for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

If Reorganized Tenrgys elects to be taxed as a corporation, unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of Reorganized Tenrgys membership interests. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the interests for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

### (c) Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of stock.

### D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

#### 1.    Consequences to Non-U.S. Holders of Claims

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holders should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such non-U.S. Holders and the ownership and disposition of the various forms of consideration non-U.S. Holders may receive under the Plan.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

#### (a)    Gain Recognition

Subject to the FIRPTA rules discussed below, any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

#### (b)    Accrued Interest and Interest Payable on Exit Facility

Payments to a non-U.S. Holder that are attributable to accrued but untaxed interest, and interest on debt instruments received under the Plan, generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior

to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

(i)    the non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of Tenrgys's membership interests (in the case of recoveries in respect of Claims against the Debtors) or Reorganized Tenrgys, as applicable (in the case of the new debt instruments issued under the Plan) entitled to vote (after application of certain attribution rules);

(ii)   the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to (in the case of recoveries in respect of Claims against the Debtors) or Reorganized Tenrgys, as applicable (in the case of the new debt instruments issued under the Plan) (each, within the meaning of the Tax Code);

(iii)  the non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

(iv)   such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### E.    Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest or other payments. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: October 1, 2021

**TENRGYS, LLC,**
on behalf of itself and all other Debtors

/s/ Richard H. Mills, Jr.
Richard H. Mills, Jr., Manager

Glenn Gates Taylor, MSB No. 7453
John H. Geary, Jr., MSB No. 101540
Christopher H. Meredith, MSB No. 103656
COPELAND, COOK, TAYLOR & BUSH, P.A.
P.O. Box 6020
Ridgeland, MS  39158
Telephone:  (601) 856-7200
Facsimile:  (601) 856-7626
gtaylor@cctb.com
jgeary@cctb.com
cmeredith@cctb.com
*Proposed Counsel for the Debtors*

## CERTIFICATE OF SERVICE

Service provided via Notice of Electronic Filing (NEF) through ECF to all parties signed

up to receive such notices, including the following:

Timothy J. Anzenberger        tim.anzenberger@arlaw.com
John Martin Flynt             jflynt@brunini.com
James A. McCullough, II       jmccullough@brunini.com
J. Walter Newman, IV          wnewman95@msn.com
Sylvie Derdeyn Robinson       bankruptcy.attorney@dor.ms.gov
Christopher J. Steiskal, Sr.  christopher.j.steiskal@usdoj.gov
United States Trustee         USTPRegion05.JA.ECF@usdoj.gov

**THIS** the 1st day of October, 2021.

/s/ Christopher H. Meredith
*Of Counsel*